IN THE CIRCUIT COURT OF BENTON COUNTY, ARKANSAS

```
                                              2012 MAY  2  PM 1 33
                                              BRENDA D. SHIELDS
                                              CLERK AND RECORDER
                                              BENTON COUNTY, AR
                                              FILED
```

ESCAPES!, INC.; COOPER COMMUNITIES, INC.,
a Delaware Corporation; COOPER REALTY
INVESTMENTS, INC., an Arkansas Corporation;
COOPER LAND DEVELOPMENT, INC., an Arkansas
Corporation; ESCAPES! TRAVEL CHOICES, LLC.,
an Arkansas Limited Liability Company; and
ESCAPES! PROPERTY MANAGEMENT, LLC.,
an Arkansas Limited Liability Company                         **PLAINTIFFS**

VS                              Case No. CV-2012-64-4

J. PAUL TAPPANA;
STONEBRIDGE MANAGEMENT,
a Missouri Limited Liability Company;
NATALIE BOBSIN; and
DEBORAH GRAF                                                 **DEFENDANTS**

## SECOND AMENDED COMPLAINT AND MOTION FOR CONTEMPT

Come now the Plaintiffs, and for their Second Amended Complaint and Motion

for Contempt against the Separate Defendants, Stonebridge Management, Natalie

Bobsin, and Deborah Graf, respectfully state:

### I. PARTIES

1.      Escapes!, Inc., an Arkansas corporation; Cooper Communities, Inc., a

Delaware Corporation; Cooper Realty Investments, Inc., an Arkansas corporation;

Cooper Land Development, Inc., an Arkansas Corporation; Escapes! Travel Choices,

LLC, an Arkansas limited liability company; and Escapes! Property Management, LLC,

an Arkansas limited liability company are all affiliated companies engaged in the

development and/or management of planned community developments including condominiums and timeshares located throughout the southeastern United States.

2.      J. Paul Tappana is a resident of Reeds Spring, Missouri and until April 15, 2011 was an employee of Escapes!, Inc.

3.      Stonebridge Management ("Stonebridge Management") is a Missouri limited liability company formed for the purpose of property management of condominiums and timeshares.  Upon information and belief its principals include Phil West and J. Paul Tappana.

4.      As set forth throughout this Second Amended Complaint and Motion for Contempt, Stonebridge Management has extensive contacts with Arkansas, including the following:

a.      Phil West is a principal of Stonebridge Management, residing in Springdale, Arkansas, and conducts most of his and Stonebridge Management's top level business while geographically present in Arkansas.

b.      Stonebridge Management has mailed instructional correspondence to various Escapes timeshare owners residing in Arkansas to inform these Arkansas timeshare owners that Stonebridge Management had taken over the reservation function of their timeshare owners associations.  Stonebridge Management cannot perform its purported management functions without mailing such information to the Escapes timeshare owners residing in Arkansas.

c.      Stonebridge Management, realizing that it cannot perform full reservation functions without the assistance of Escapes' reservations department, which is located in Bella Vista, Arkansas, has caused its reservations agent(s) to coordinate

2

certain reservations activities via e-mail contact with Escapes' Arkansas reservations department.

        d.     Vacation Rentals, located in Bella Vista, Arkansas, performs accounting services, annual meeting proxy mail outs, and other services for Stonebridge Management.  This performance occurs in Arkansas.

    5.     Natalie Bobsin is a resident of Missouri, is currently an employee of Stonebridge Management and was an employee of Cooper Communities, Inc., where she performed services for Escapes! Inc., Escapes! Travel Choices, LLC, and Escapes! Property Management, LLC.

    6.     Deborah Graf is a resident of Crane, Missouri, is currently an employee of Stonebridge Management, and was an employee of Escapes!, Inc. and Escapes! Property Management, LLC as Vice-President of Operations and she was thus often physically present, and conducted business in, Escapes' Arkansas corporate office, and in Escapes' Arkansas resorts in both Bella Vista, Arkansas and in Hot Springs Village, Arkansas.

## II. BACKGROUND

    7.     Escapes!, Inc. is the developer of timeshare resorts located in Branson, Missouri, Hot Springs, Arkansas, Bella Vista, Arkansas, Orange Beach, Alabama, Panama City Beach, Florida, and Galveston, Texas.  In Branson, Missouri, Escapes!, Inc. developed four (4) separate timeshare resorts.  In Orange Beach, Alabama, Escapes!, Inc. is the vacation week developer of two (2) separate timeshare resorts, Palm Beach Condominium and Escapes! to the Shores Condominium.

    8.     Central to the operation of each timeshare resort developed by Plaintiffs is

the management of various essential services. These essential services include activities such as reservations, check-in, check-out, maintenance, cleaning, landscaping, management of assessments, scheduling of vacations, coordination with other affiliated timeshare resorts for the exchange of vacation weeks between the respective owners, and general maintenance and day-to-day operation of a condominium/timeshare resort. Escapes! Property Management, LLC (EPM) is a wholly owned subsidiary of Escapes!, Inc. EPM manages the essential functions of scheduling, administration, maintenance and upkeep for timeshare resort/condominiums developed by Plaintiffs.

Escapes! Travel Choices, LLC (ETC) is a wholly owned subsidiary of Escapes!, Inc. ETC operates and controls the reservation functions for the Escapes! Travel Choices points program which allows timeshare owners enrolled in ETC to make reservations at various affiliated resorts according to rules established by ETC.

9.      Each timeshare resort developed by Plaintiffs requires the services of a management company to perform the essential services set out above. The proper and efficient operation of the property management function is critical to the enjoyment of the timeshare resort and condominium properties purchased by their respective owners. Absent proper, efficient and effective management of the timeshare resort/condominiums, the value of an owner's investment in a condominium or timeshare resort is substantially reduced. Likewise, absent efficient, proper and effective management of the various properties by the management company, the value of the remaining timeshare inventory owned by Plaintiffs in the various timeshare resort/condominiums is substantially reduced.

4

10.     The declarations and by-laws of each timeshare resort/condominium facility govern the management of the facility through non-profit corporations.  A facility may be governed by either a Condominium Owners Association (COA) or a Vacation Owners Association (VOA) or, in some instances, may be governed by both organizations.  The COA and VOA are separate non-profit organizations.  In a resort featuring both organizations, the COA governs condominium affairs and the VOA governs timeshare affairs and is a component member of the COA.  The officers of the non-profit corporations are elected pursuant to the rules of election provided by law and in the specific resort declaration and by-laws.  The Palm Beach Condominium is governed by two associations, the Palm Beach Condominium Owners Association, Inc. ("Palm Beach COA") and the Palm Beach Vacation Owners Association, Inc. ("Palm Beach VOA").

11.     In most instances, the COA and/or VOA choose to discharge their management functions by entering into management agreements with a property management company to provide the management services essential to the operation of the timeshare resort/condominium in exchange for payment of a management fee funded by assessments of the units committed to interval or whole ownership.

12.     Plaintiff Escapes! Property Management, LLC (EPM) is the property management firm under contract with each of the timeshare resort/condominiums developed by Plaintiffs.  Specifically, EPM has been operating under a management agreement with the Palm Beach VOA in Orange Beach, Alabama since February 18, 2001 and has been under an agreement for local management services with the Palm Beach COA since February 1, 2005.

13.    There are similar management agreements in effect between Escapes! Property Management, LLC and each of the COAs and VOAs for all of the properties developed by Plaintiffs.

### III. THE NON-COMPETE, NON-INTERFERENCE AGREEMENT AND CONSENT DECREE ORDERING INJUNCTION

14.    Prior to May 20, 2011, J. Paul Tappana was employed by Escapes!, Inc. as well as Escapes! Property Management, LLC and the other named Plaintiffs as Vice President of Operations.  He was principally responsible for managing, overseeing and directing the entire timeshare business of Plaintiffs including development, sales, and management of the timeshare units.

15.    In his employment capacity, J. Paul Tappana became completely knowledgeable of the entire business operations of Plaintiffs.

16.    On May 20, 2011, J. Paul Tappana entered into an Agreement with Plaintiff Escapes!, Inc. on behalf of all of the named Plaintiffs above.  Said Agreement is confidential and, thus, has been filed with the original complaint herein under seal for review by the Court only.

17.    Said Agreement was entered into for good and valuable consideration and conferred numerous substantial benefits upon J. Paul Tappana as well as obligated him to refrain from certain activity and actions which would be severely detrimental and would cause irreparable harm to Plaintiffs.

18.    Specifically, J. Paul Tappana agreed not to offer employment to any of Plaintiffs' employees; not to hire or attempt to hire any employees of Plaintiffs; not to induce or attempt to induce any employee of Plaintiffs to: (1) terminate his/her employment with any of Plaintiffs' or Plaintiffs' affiliates; (2) become employed by a

competitor of Plaintiffs' or Plaintiffs' affiliates; or (3) establish or participate in establishing, in any market which Plaintiffs operate, any business in which Plaintiffs are engaged at the time of the inducement or attempt to induce.   Furthermore, J. Paul Tappana agreed that he would not compete with any of the Plaintiffs, and he further agreed to some specific terms defining the competition he was prohibited from conducting.  Specifically, he agreed not to:

> "(1)    Directly or indirectly engage within a three (3) mile radius of any of Company's business locations (the "Territory"), ...in the offering or providing (either directly or through an entity:  (a) owned in whole or in party buy you; (xxx) by which you are employed; (b) from which you receive, in any way or form, compensation, such as, but not limited to, compensation received by you through acting as a consultant; or (c) for your own account, for the account of your employer or for the account of a principal for whom you or your employer acts as broker or agent) in the sale of any merchandise or the providing of any services that are similar to or competitive with any goods and merchandise or any service offered by Company.  For purposes of this Letter, you will be deemed to be indirectly engaged in the offering or provision of services if you serve as an officer, director, employee or agent of; or otherwise advise or assist or have any material active or passive interest (whether as proprietor, partner, stockholder, lender, or otherwise but excluding the ownership of less than 5% of the outstanding shares or other units of a class of publicly traded securities) in any person, firm, corporation, association, or other business entity that is engaged in the offering or provision of those services, and you or any person, firm, corporation, association or other business entity will be deemed to be engaged in the offering or provision of services in the Territory if you or they provide or offer those services at or from a location, to persons resident, or regarding real property located in the Territory; or
>
> (2)    In any capacity, solicit (for your own account, for the account of your employer or for the account of a principal for whom you or your employer acts as broker or agent), in competition with Company, business from any client, customer, contractor or subcontractor with which Company has done business within one (1) year prior to the date of your execution and delivery of this Letter."

19.    J. Paul Tappana further agreed that remedies at law for any breach by the other party of the obligations contained in the Agreement would be inadequate and

that the non-breaching party would be entitled to injunctive or other equitable relief for any violation, without posting any bond that might otherwise be required.  He further agreed to treat any non-public or confidential information which he had received regarding any of Plaintiffs' business operations, customers, employees, plans, prospects and properties confidential and agreed to not use it in any manner detrimental to Plaintiffs.

20.    Notwithstanding the terms of the agreement entered into on May 20, 2011, J. Paul Tappana and Phil D. West organized Stonebridge Management for the purposes set forth above.

21.    Plaintiffs thereafter filed this lawsuit against J. Paul Tappana and Stonebridge Management requesting an injunction and a temporary restraining order.

22.    The Plaintiffs and J. Paul Tappana and Stonebridge Management entered a Consent Decree Ordering Injunction, which was filed herein on January 27, 2012.  A true and correct copy of the Consent Decree Ordering Injunction is attached hereto and incorporated herein word for word.

## IV.  RESTATEMENT OF ALLEGATIONS AND COMPLAINTS

23.    All allegations and requests for relief contained in both the Complaint for Injunction and Temporary Restraining Order filed January 13, 2012, and in the Amended Complaint and Motion for Contempt filed February 16, 2012, to the extent not otherwise dismissed by this Court and/or modified herein are hereby restated.

## V.    TORTIOUS INTERFERENCE WITH CONTRACTS AND CIVIL CONSPIRACY
### BY STONEBRIDGE MANAGEMENT, NATALIE BOBSIN, AND DEBORAH GRAF

24.    The Plaintiffs adopt and incorporate paragraphs 1 through 22.

8

25.     Natalie Bobsin is currently an employee of Stonebridge Management.

26.     There exist and continue to exist valid, binding agreements between the Plaintiffs and J. Paul Tappana and Stonebridge Management.   Natalie Bobsin and Deborah Graf have specific knowledge of the same, and in particular, the various prohibitions agreed to by J. Paul Tappana in the Agreement dated May 20, 2011 and by J. Paul Tappana and Stonebridge Management in the Consent Decree Ordering Injunction.

27.     Stonebridge Management, Natalie Bobsin, and Deborah Graf also have specific knowledge of the contractual relationships between the Plaintiffs and the Palm Beach VOA and the Palm Beach COA.  Specifically, they are aware of the property management agreement between EPM and the Palm Beach VOA, the property management agreement with EPM and the Palm Beach COA, and the resort affiliation agreement between EPM, ETC, and the Palm Beach VOA

28.     Nevertheless, Natalie Bobsin and Deborah Graf, employees of Stonebridge Management, have conspired with J. Paul Tappana and Stonebridge Management, as well as other employees/agents of Stonebridge Management, to improperly interfere with the contractual relationships the Plaintiffs have with the Palm Beach VOA, the Palm Beach COA, and J. Paul Tappana.  The conspiracy includes, but is not limited to, a scheme to utilize Natalie Bobsin's alleged status as a vacation week owner and their alleged statuses as directors of the Palm Beach VOA's board to mask the ultimate goal of improperly interfering with the contractual relationships the Plaintiffs have with the Palm Beach VOA and the Palm Beach COA and to steal a management agreement for Stonebridge Management's benefit.

9

29.   While physically present in the state of Arkansas, J. Paul Tappana, with the assistance of Phil D. West, a resident of Arkansas, hatched and participated in the scheme to form Stonebridge Management in order to take over the management agreements at issue for the benefit of Stonebridge Management.   Steps to form Stonebridge Management for these wrongful and tortious purposes were undertaken while they were physically present in Arkansas.   Furthermore, Stonebridge Management was formed to wrongfully attempt to circumvent the terms, conditions, and restrictions of the non-Compete, non-Interference Agreement, which was executed in Arkansas by J. Paul Tappana and which is governed by Arkansas law.

30.   Natalie Bobsin, a former employee of Cooper Communities, Inc., where she performed services for Escapes! Inc., Escapes! Travel Choices, LLC, and Escapes! Property Management, LLC, gained extensive and confidential information about the Plaintiffs while she was physically present and working in Arkansas.   She has utilized said information about the Plaintiffs in furtherance of the conspiracy to interfere with the contractual relationships of the Plaintiffs and to steal the management agreements for Stonebridge Management.

31.   Natalie Bobsin and Stonebridge Management have further conspired with Deborah Graf, a current employee of Stonebridge Management, to improperly interfere with the contractual relationships the Plaintiffs have with the Palm Beach VOA, the Palm Beach COA, and J. Paul Tappana.   Deborah Graf was formerly employed by Plaintiffs Escapes!, Inc. and Escapes! Property Management, LLC as Vice-President of Operations, and she was thus often physically present, and conducted business in, Escapes' Arkansas corporate office.

32.     Following Deborah Graf's resignation in December 2011, Stonebridge Management immediately employed her.  In fact, Stonebridge Management had already employed her prior to her resignation and set up an email address for her which she was utilizing in late December, 2011.  Plaintiffs subsequently discovered that many of her actions while employed by Plaintiffs were calculated and designed to benefit Stonebridge Management and to result in detriment and harm to the Plaintiffs.  Such actions often took place in Arkansas and were undertaken to further assist Stonebridge Management in its attempts to tortiously interfere with the Plaintiffs' existing management agreements, and to obtain the management agreements for the benefit of Stonebridge Management.  While still employed for the Plaintiffs, but clearly working for the benefit of Stonebridge Management, she even accessed her email account with the Plaintiffs, which are Arkansas entities, in order to relay to third parties, including Natalie Bobsin, internal company communications about when a purported cancellation of the management agreement had occurred.

33.     Deborah Graf also attempted to terminate the employment of certain Escapes! employees in the Palm Beach resort with no authorization from Escapes! to do so, and she then immediately attempted to rehire them for Stonebridge Management.  She delivered the documentation evidencing such terminations to the corporate office of Escapes! in Arkansas, the ultimate location to which such personnel attorn.

34.     Natalie Bobsin and Deborah Graf also engaged in a conference call originating in Arkansas and with at least one party, Richard Smith, present in Arkansas. The conference call was purportedly a special meeting of the board of directors of the

11

Palm Beach VOA wherein Natalie Bobsin was purportedly appointed as a director to the board.  (At the time of such appointment, Richard Smith and Deborah Graf occupied the two remaining Palm Beach VOA director board seats.)  During that same conference call, and despite just being elected to the position, she then immediately voted to offer a new management contract to Stonebridge Management.  Deborah Graf also voted to offer the same management contract to Stonebridge Management.

35.     Thereafter, J. Paul Tappana, on behalf of Stonebridge Management entered into negotiations for the management agreement at Palm Beach.  He sent numerous emails to Dick Smith, an individual residing in Arkansas, discussing and negotiating the specific terms of the management agreement.

36.     Natalie Bobsin and Deborah Graf both thereafter sent emails to Dick Smith, an individual residing in Arkansas, stating that they had no issues with him signing the management agreement with Stonebridge Management.  Upon information and belief, the management agreement with Stonebridge Management was subsequently executed in Arkansas, at least in part, by Dick Smith purportedly on behalf of the Palm Beach VOA.

37.     When the Plaintiffs subsequently informed the Palm Beach VOA that its purported termination of the management agreement was invalid, Deborah Graf, at the request of J. Paul Tappana, emailed information that Natalie Bobsin had learned while employed with the Plaintiffs about the resort affiliation agreement between EPM, ETC, and the Palm Beach VOA.  While employed with the Plaintiffs, Natalie Bobsin was actually researching the Plaintiffs' agreements in an effort to benefit Stonebridge Management and steal the management agreements.

38.     Shortly after the Plaintiffs informed the Palm Beach VOA that its purported termination of the management agreement was invalid, Deborah Graf arranged with Natalie Bobsin, Dick Smith, J. Paul Tappana, and Phil West to attend a board of directors meeting of the Palm Beach VOA.  To attend the meeting, these individuals had to call a conference line of Vacation Rentals, Inc., which is located in Bella Vista, Arkansas.  Not only did this conference call require dialing into the number of this Arkansas business, but, in furtherance of the conspiracy it also included J. Paul Tappana and Phil West, an Arkansas resident, who have no connection to the Palm Beach VOA board and are only connected with Stonebridge Management.

39.     Stonebridge Management, Natalie Bobsin, and Deborah Graf have enticed and encouraged the Palm Beach VOA and the Palm Beach COA to take steps to terminate the property management agreements, remove EPM as property manager, and appoint a new manager in violation of the parties' agreements; and they have enticed and encouraged the employees of EPM to terminate their employment with EPM and become an employee of Stonebridge Management for the express purpose of stealing the property management agreements.

40.     As a result of the tortious actions of Stonebridge Management, Natalie Bobsin, and Deborah Graf and as a result of the above mentioned conspiracy, EPM has lost employees and the Palm Beach VOA and the Palm Beach COA have taken steps to terminate the property management agreements, remove EPM as property manager, and appoint a new manager, including an attempt to appoint Stonebridge Management as manager, in violation of the parties' agreements.

41.     Stonebridge Management, Natalie Bobsin, and Deborah Graf have also conspired to assist J. Paul Tappana with unlawfully attempting to circumvent his non-compete, non-interference agreement with the Plaintiffs.  J. Paul Tappana has in fact breached said agreement with the assistance of Stonebridge Management and Natalie Bobsin.  The Plaintiffs have incurred attorneys' fees in enforcing the agreement, have lost employees as a result of the breach, and the Palm Beach VOA and the Palm Beach COA have taken steps to terminate the property management agreements, remove EPM as property manager, and appoint a new manager, including an attempt to appoint Stonebridge Management as manager as a result of the breach.

42.     As a result of the aforesaid actions of Stonebridge Management, Natalie Bobsin, and Deborah Graf, the Plaintiffs have been damaged in an amount that exceeds the amount necessary for federal court jurisdiction in diversity of citizenship cases.

43.     Stonebridge Management, Natalie Bobsin, and Deborah Graf have engaged in said tortious activity both prior to and subsequent to the entry of the Consent Decree Ordering Injunction in this matter and have done so in an effort to steal the property management agreements for Stonebridge Management, to assist J. Paul Tappana in attempting to unlawfully circumvent the non-compete, non-interference agreement, and/or to otherwise harm the Plaintiffs.

44.     Judgment should be entered against Separate Defendants Stonebridge Management, Natalie Bobsin, and Deborah Graf for damages in excess of the amount necessary for federal diversity jurisdiction and for any other actual, incidental, special, compensatory, punitive and/or other applicable damages resulting from the Separate

Defendants' tortious activities and participation in the above conspiracy, for Plaintiff's reasonable attorneys' fees, court costs, and expenses in this matter, and for any and all other relief to which the Plaintiffs may show themselves entitled.

## VI.  BREACH OF SEVERANCE AGREEMENT BY NATALIE BOBSIN

45.     The Plaintiffs adopt and incorporate paragraphs 1 through 42.

46.     Natalie Bobsin was an employee of Cooper Communities, Inc., where she performed services in Arkansas for Escapes! Inc., Escapes! Travel Choices, LLC, and Escapes! Property Management, LLC.

47.     Cooper Communities, Inc. is the sole shareholder of Escapes!, Inc, Escapes!, Inc. is the sole member of Escapes! Property Management, LLC, and Escapes!, Inc. is the sole member of Escapes! Travel Choices, LLC.  As a result of her employment, Natalie Bobsin was aware that the Plaintiffs were all affiliated companies engaged in the development and/or management of planned community developments including condominiums and timeshares located throughout the Southeastern United States.

48.     On or about April 17, 2009, Natalie Bobsin entered into a Severance Agreement with Plaintiff Cooper Communities, Inc.  Pursuant to the terms and conditions contained therein, the Severance Agreement is made and entered into in the State of Arkansas and in all respects shall be interpreted, enforced, and governed by the laws of Arkansas.  A true and correct copy of the Severance Agreement is attached hereto and incorporated herein word for word.

49.   In return for Plaintiff Natalie Bobsin's agreements contained in the Severance Agreement, Plaintiff paid Natalie Bobsin the sum of Ten Thousand Six Hundred Fifty One Dollars and Ninety Six Cents ($10,651.96).

50.   In the Severance Agreement, Natalie Bobsin agreed to not harm the company's reputation, good will or commercial interests. In breach of the Severance Agreement, Natalie Bobsin has enticed and encouraged the Palm Beach VOA and the Palm Beach COA to take steps to terminate the property management agreements of the Plaintiffs, remove EPM as property manager, and appoint a new manager in violation of the parties' agreements; and she has enticed and encouraged the employees of EPM to terminate their employment with EPM and become an employee of Stonebridge Management for the express purpose of stealing the property management agreements. Natalie Bobsin has also joined in a lawsuit in Alabama in an effort to terminate the property management agreements EPM has with the Palm Beach VOA and the Palm Beach COA. Natalie Bobsin also became an employee of Stonebridge Management and attempted to use her purported status on the board of the Palm Beach VOA to extend a management contract to Stonebridge Management. All of these actions of Natalie Bobsin have damaged the reputation, good will and commercial interests of the Plaintiffs.

51.   As a result of her employment, Natalie Bobsin received non-public and confidential information of the Plaintiffs.

52.   In the Severance Agreement, Natalie Bobsin also agreed to keep the confidential information confidential and not to use it in any way detrimental to the Plaintiffs. In beach of the Severance Agreement, Natalie Bobsin has disclosed said

confidential information to the Palm Beach VOA, the Palm Beach COA, and others, used the confidential information to the detriment of the Plaintiffs, and did so in an effort to achieve the termination of the above mentioned property management agreements, to bring suit against a number of the Plaintiffs herein, and to otherwise harm the Plaintiffs.

53.    In the Severance Agreement, Natalie Bobsin also agreed that she would not file any claims, charges, or complaints against the Plaintiffs and that she would participate in the defense of any matter involving the Plaintiffs.   In breach of the Severance Agreement, Natalie Bobsin has caused to be filed a lawsuit in Alabama against a number of the Plaintiffs hereto and thus cannot take part in the defense of said Plaintiffs.   The Plaintiffs have incurred, and will continue to incur, significant expenses to defend against the lawsuit filed by Natalie Bobsin and have otherwise been damaged.

54.    As a result of the above mentioned actions of Natalie Bobsin, she is in breach of the Severance Agreement, and as a consequence the Plaintiffs have been damaged as set forth above in an amount that exceeds the amount necessary for federal court jurisdiction in diversity of citizenship cases.

55.    Plaintiffs herein pray that Natalie Bobsin be ordered to reimburse Plaintiffs for any and all expenses incurred by them, including reasonable attorneys' fees and court costs, and for all other relief to which they may show themselves entitled.

## VII. MOTION FOR CONTEMPT

56.    The Plaintiffs adopt and incorporate paragraphs 1 through 53.

57.     The Separate Defendants J. Paul Tappana and Stonebridge Management have agreed to the Consent Decree Ordering Injunction filed herein on January 27, 2012.

58.     Stonebridge Management is a corporate entity and is comprised of employees that act on its behalf.   The Separate Defendants Natalie Bobsin and Deborah Graf, as employees of Stonebridge Management, are bound by the terms and conditions of the Consent Decree Ordering Injunction filed herein.

59.     Separate Defendants Stonebridge Management, Natalie Bobsin, and Deborah Graf have willfully and wrongfully failed and refused to comply with the Court's Consent Decree Ordering Injunction in that they have engaged in the improper and tortious actions set forth above and have otherwise continued to improperly interfere with the contractual relationships the Plaintiffs have with the Palm Beach VOA and the Palm Beach COA.

60.     An Order should be issued for Separate Defendants Stonebridge Management, Natalie Bobsin, and Deborah Graf to show cause why they should not be cited for contempt of Court and punished accordingly.

61.     Plaintiffs herein pray that Separate Defendants Stonebridge Management LLC, Natalie Bobsin, and Deborah Graf be ordered to reimburse Plaintiffs for any and all expenses incurred by them, including reasonable attorneys' fees and court costs, and for all other relief to which they may show themselves entitled.

WHEREFORE, the Plaintiffs pray that they be awarded judgment against Separate Defendants Stonebridge Management, Natalie Bobsin, and Deborah Graf in an amount that exceeds the amount necessary for federal court jurisdiction in diversity

of citizenship cases; that the Court enter an Order directing the Clerk of the Court to issue an Order to Stonebridge Management, Natalie Bobsin, and Deborah Graf requiring them to appear and show cause, if any there be, why they should not be held in contempt and punished accordingly; that a temporary and permanent injunction be entered prohibiting and enjoining Natalie Bobsin from continuing her unlawful actions in breach of the Severance Agreement; that punitive damages be awarded in amount sufficient to render the consequences of their tortious and improper conduct an example to themselves and to others in an amount to be established at trial; and for any and all other relief to which the Plaintiffs may be entitled.

ESCAPESI, INC.; COOPER COMMUNITIES, INC.,
A Delaware Corporation; COOPER REALTY INVESTMENTS, INC., an Arkansas Corporation; COOPER LAND DEVELOPMENT, INC, an Arkansas Corporation; ESCAPESI TRAVEL CHOICES, LLC, an Arkansas Limited Liability Company; and ESCAPESI PROPERTY MANAGEMENT, LLC., an Arkansas Limited Liability Company

By: _____
David R. Matthews, Their Attorney
Arkansas Bar #76072
C. Eric Vester, Their Attorney
Arkansas Bar #2005231
MATTHEWS, CAMPBELL, RHOADS, McCLURE, THOMPSON, & FRYAUF, P.A.
119 South Second Street
Rogers, Arkansas 72756-4525
(479) 636-0875

## CERTIFICATE OF SERVICE

I, David R. Matthews, attorney for the Plaintiffs herein, state that I have on this _____ day of _May_ _____ 2012, mailed a true and correct copy of the above and foregoing instrument to Timothy Hutchinson, attorney for Stonebridge Management, LLC, 5417 Pinnacle Point Dr., Suite 201, Rogers, AR 72758, Donald Brady, attorney for J. Paul Tappana, 109 N. 34th St., Rogers, AR 72757, and S. Lance Cox, attorney for Natalie Bobsin, P.O. Box 878, Fayetteville, AR 72702, in the United States mail, postage prepaid.

_____

David R. Matthews

**NOTE:** THIS IS A LEGAL AND BINDING AGREEMENT, CONTAINING A WAIVER AND RELEASE OF CLAIMS.

## SEVERANCE AND RELEASE AGREEMENT

THIS **SEVERANCE AND RELEASE AGREEMENT** ("Agreement") is made and entered into by and between **Helen Bobsin** ("Employee"), an individual and resident of the State of Arkansas, and **Cooper Communities Inc.**, a Delaware corporation ("Company"). Company and Employee are referred to collectively herein as the "Parties," and individually as a "Party." In addition, Employee is from time to time referred to in this Agreement as "You," and Company is from time to time referred as "We" or "us".

### WITNESSETH:

A.     The Parties desire, upon termination of their employment relationship, to end, finally and forever all matters between them arising out of Employee's employment with, compensation from, and separation from Company.

NOW **THEREFORE**, in consideration of the above premises and the mutual covenants and agreements contained herein, the Parties agree as follows:

### ARTICLE I

1.1     <u>No Admission of Liability</u>.  You and we agree that this Agreement shall not be deemed to be nor construed as an admission of liability by us, or as an admission that we, our parent or sister companies, or any of our directors, officers, agents or employees have violated any contractual, statutory, common law, implied, or other duty allegedly owed to you.  We specifically deny any liability to, or wrongdoing or discrimination against, you or any other person, and we affirmatively state that we have fully complied with all applicable statutes, regulations, and ordinances.

1.2     <u>Acceptance or Rejection of Agreement</u>.  You acknowledge and agree that:

(a) This Agreement was provided to you on or before April 18, 2009;

_HNB_
**Initials**

(b) You have until the close of business on May 18, 2009 in which to review and accept or reject this Agreement, and if not signed by you and returned to and received by us on or before May 18, 2009, this Agreement shall terminate and have no effect.  Please know that this is a firm period of time and will not be extended by any modifications we make to this Agreement.

A stamped, self-addressed envelope has been provided you to return this Agreement to us. To effect acceptance, you must, on or before the deadline set forth in Section 1(b) above, deliver a properly and manually signed original of this Agreement to: Ms. Carmen Burasco, Director of

Human Resources, 903 North 47th Street, Rogers, AR 72756. You hereby acknowledge that if you desire to accept this Agreement you are solely responsible for ensuring that we receive the properly signed Agreement prior to expiration of the above deadline.

1.3    Effect of Agreement. You have been advised that you have the right to consult with an attorney and other advisors of your choice regarding this Agreement.

You represent and warrant to us that: (a) you have had adequate opportunity and time to both review this Agreement and seek legal advice regarding what it says and obligates you to do; (b) you have carefully read and understand this Agreement; (c) you have signed this Agreement as your free act and deed, voluntarily, knowingly and without duress or coercion; and (e) you understand fully that this Agreement contains a knowing and voluntary waiver by you of claims regarding your employment with us.

1.4    Termination of Relationship. You and we agree that this Agreement completes, fully and finally, the employment relationship between us. You further agree that you will not seek employment with us, and that we can decline to accept any employment application from you and without a Claim from you as a result of our actions.

## ARTICLE II

2.1    Severance Payment. In return for your agreements contained herein and your signing of this Agreement, we agree to pay you a severance payment, payable in installments (the "Severance Payments"), equal to the gross sum of Ten Thousand Six Hundred Fifty One Dollars and Ninety Six Cents ($10,651.96), less applicable withholdings. We agree to make such Severance Payments in recognition of your prior service and in return for your release, set forth in Article IV below, of claims, obligations, and liabilities. You agree that such Severance Payments constitute a payment of severance and do not extend the term of your employment. We will pay you the first of the Severance Payments ("Initial Severance Payment") within seven (7) days (except in the case of a cause beyond our control) after your timely return to us of this Agreement, properly executed. After the Initial Severance Payment you will receive four (4) additional Severance Payments approximately every two (2) weeks thereafter until your severance is paid in full.

2.2    PTO's. Any unused paid time off which you have earned but not used will be calculated to the date your employment with us terminates, March 20, 2009 (the "Termination Date"), and included in the severance payment if not previously paid by us.

2.3    Termination of Benefits. Your participation in the following will end at midnight on the Termination Date, and you will not earn or receive additional benefits under any of the following after midnight on the Termination Date: (a) the Company's profit sharing plan, 401(k) plan and all other incentive compensation plans; and (b) the Company's long-term disability, workers' compensation and Company-paid life insurance plans. In addition, the Company's medical insurance benefits terminate on the last day of the calendar month in which the Termination Date occurs. You shall keep, however, all rights vested under such plans and all vested benefits earned or accrued under such plans. You will also be offered the opportunity to elect COBRA benefits; doing so, however, is your responsibility and you must obtain the necessary

Helen Natalie Bobsin.DOC 6/19/08                                        2

forms and fill them out to be eligible for COBRA benefits.

2.4     No Further Consideration.  You agree that the consideration set forth above shall be all that you will receive under this Agreement, and that you will not seek from us any further compensation regarding the matters encompassed by this Agreement.

## ARTICLE III

3.1     Charges.  You hereby affirm to us that you have not filed, nor caused to be filed, and are not presently a party to, any charge or Claim against us with any federal, state or local governmental entity.

3.2     Hours Worked.  You hereby affirm to us that you have reported to us all hours you have worked for us as of the date you have signed this Agreement, and that you have received from us all compensation, wages, bonuses, commissions and other benefits to which you are entitled.

3.3     Leave.  You hereby affirm to us that you have been granted any leave to which you were entitled under the Family Medical Leave Act and any related state or local leave or disability accommodation laws.

3.4     No Injuries.  You hereby affirm to us that you do not have and have not suffered any injuries connected, directly or indirectly, with our workplace or diseases connected directly or indirectly to your employment by us.

3.5     No Disclosure.  You hereby affirm to us that you have not disclosed any Confidential Information, as such term is defined in Section 6.1 below.

3.6     No Retaliation.  You hereby affirm to us that you have not been retaliated against by us or by any of our officers, directors, employees or agents for reporting any allegations of wrongdoing by us, our parent and sister companies or our or their officers, directors or employees.

3.7     No Harm to Company Reputation.  You agree that you will not harm our reputation, good will or commercial interests in your written or oral communications with any other person or entity.

3.8     No Exercise of Authority.  You hereby affirm to us that you have not exercised any actual or apparent authority on our behalf or entered into any agreements with any of our employees, past or present, which you have not disclosed to us or which could be binding upon us.

3.9     Further Assistance.  You agree that, upon our request, conveyed to you in writing, you will participate in the investigation, prosecution or defense of any matter involving us.  We agree that if we make such a request we will reimburse you for any reasonable travel or out of pocket expenses you incur in providing such participation.  You and we agree that such reimbursement will be provided solely to avoid cost to you and not to influence or condition your participation.

## ARTICLE IV

4.1     _Release and Waiver._ In return for our payment of the consideration outlined in Article II above, which you acknowledge to be sufficient, you, for yourself and your family, dependents, heirs, executors, agents, representatives, administrators, successors, and assigns, do hereby irrevocably and forever waive, release and discharge us and our parent company, our sister companies and our directors, officers, employees, agents and representatives from any and all claims and liabilities of every kind and character that may legally be waived by this Agreement (collectively referred to as "Claims"), whether you are aware of such Claims or not, which you have or may have had caused by or arising directly or indirectly out of your employment by us, your compensation from us or the termination of your employment, in each case to and including the date of this Agreement.

4.2     _Claims included in Waiver and Release._

(a)     You include in such release and waiver any Claims that you have or may have had under:

(a)     Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, _et seq._);
(b)     The Civil Rights Acts of 1866, 1871, 1963 and 1991;
(c)     The Americans with Disabilities Act of 1990, as amended (42 U.S.C. § 12101 _et seq._);
(d)     The Rehabilitation Act of 1973 (29 U.S.C. § 701, _et seq._);
(e)     The Fair Labor Standards Act (29 U.S.C. § 201, _et seq._);
(f)     The Equal Pay Act of 1963 (29 U.S.C. Chapter 8, §§ 206(d), _et seq._);
(g)     The Family and Medical Leave Act of 1993 (29 U.S.C. § 2601-2654, _et seq._);
(h)     The Worker Adjustment and Retraining Notification Act (29 U.S.C. §2101 _et. seq._);
(i)     The Employee Retirement Income Security Act of 1974 (29 U.S.C. §1001 _et. seq._; Pub.L. 93-406)
(j)     Executive Orders 11246 and 11141;
(k)     The Constitutions of the United States of America, of Arkansas, and of all other States; and
(l)     The Arkansas Civil Rights Act of 1993 (Arkansas Code Annotated §16-123-101),

in each case as amended, supplemented or otherwise changed; and any and all Claims under the relevant federal or state statutory or common laws of the United States, of any State and of any county, municipality or other governmental subdivision of the United States, the State of Arkansas, or any other State, that may legally be waived by this Agreement.

(b)     You understand that by releasing us from these Claims, you are giving up and releasing forever rights to bring any Claim against us based on any action, decision or event herein released and occurring prior to the date of this Agreement.

(c)  You further agree, regarding any Claims that you have or may have had under the laws, acts or orders identified above, that you will not bring suit or join in any action, lawsuit or proceeding regarding any such Claims against us with the sole exception of the matters addressed in Section 7.1 below.  You further agree that one of the purposes of this Agreement is to extinguish all of your Claims that may legally be waived by this Agreement, if any, against us.  As we stated above, we deny that any such valid Claims exist.

(d)  As is set forth above, this Release waives all such claims, whether known or unknown, arising on or before the effective date of this Release.  You and we acknowledge, however, that you are not releasing: (1) your rights to enforce this Release; (2) your right, if any, to government-provided unemployment benefits; (3) your rights, if any, to government-provided workers' compensation benefits; and (4) your rights, if any, to continuation of health care coverage under the Consolidated Omnibus Reconciliation Act.  By executing this Release, you expressly waive all claims for reinstatement and reemployment by Company.

## ARTICLE V

5.1  <u>Company Employees</u>.  You agree that for one (1) year following the date of this Agreement you shall not, in any capacity (either directly or through an entity: (a) owned in whole or in part by you; (b) by which you are employed; or (c) from which you receive, in any way or form, compensation, such as, but not limited to, compensation received by your acting as a consultant):

(i) offer employment to any of our employees;

(ii) hire or attempt to hire any our employees; or

(iii) induce or attempt to induce any employee of ours to: (x) terminate his or her employment with us; (y) become employed by a competitor of ours; or (z) establish or participate in establishing, in any market in which we operate, any business in which we are engaged at the time of the inducement or attempt to induce.

## ARTICLE VI

6.1  <u>Confidential Information</u>.  You acknowledge and agree that, as a result of your employment by us, you have received non-public and confidential information (such information is referred to collectively herein as the "Confidential Information") regarding us and our business operations, customers, employees, plans, prospects and properties.  In return for our agreements in this Agreement, you agree to treat any Confidential Information, whether prepared by us, our officers, directors or employees or prepared by any agent, representative, advisor or other person for us or on our behalf, and whether oral or written and however obtained by you, as confidential and not to be used in any way detrimental to us.  You further agree that disclosure of any Confidential Information would be damaging to us, and you agree not to directly or indirectly disclose, use, copy, make lists or otherwise utilize any such Confidential Information except as we may authorize in advance and in writing.

6.2  <u>Non-Confidential Information</u>.  The term "Confidential Information" does not include information that: (i) becomes generally available to the public other than as a result of

disclosure by you; or (ii) becomes available to you on a non-confidential basis from a source other than us or our officers, directors, employees, agents, representatives or advisors provided that such source is not known by you to be bound by a confidentiality agreement with us or another obligation of secrecy or confidentiality regarding such information.

6.3   <u>Notice to Company of Request for Disclosure</u>.  If you receive a request to disclose any of the Confidential Information pursuant to a subpoena, a court order, the order of a governmental body or any other legitimate process, you agree to: (i) notify us promptly and before any disclosure is made of the terms and circumstances surrounding such request so that we may seek an appropriate protective order or waive your compliance with this Agreement; (ii) at our request and at our expense, take all reasonably necessary steps to defend against such process or claims; and (iii) permit us to participate, with counsel of our choice, in any proceeding relative to such court order or process.

ARTICLE VII

7.1   <u>Governmental Agencies</u>.  You and we acknowledge and agree that nothing in this Agreement shall be deemed or construed to limit your or our right, where applicable, to file with or participate in or assist in the investigation or processing of any charge or proceeding with or of any federal, state or local governmental agency.  You further agree that, to the extent allowed by law, and in return for the consideration given you by us under this Agreement, if you make a charge or administrative claim against us with a federal, state or local governmental agency, you will not be entitled to recover any individual monetary relief or any other individual remedy in any such proceeding.

7.2   <u>No Filing</u>.  With the sole exception of the matters addressed in Section 7.1 above, you agree that you, your heirs, representatives, executors, administrators, successors and assigns have not and will not file any claims, charges, or complaints against us.

ARTICLE VIII

8.1   <u>Binding Agreement</u>.  This Agreement shall be binding upon and inure to your benefit and the benefit of your heirs, representatives, executors, administrators, successors and assigns, and shall be binding upon and inure to our benefit.  Should either of us violate this Agreement, the other may present this Agreement to any court of competent jurisdiction to obtain legal or equitable relief.

8.2   <u>Indemnification</u>.  You agree to indemnify and hold us harmless from and against any and all losses, costs, damages, or expenses, including reasonable attorneys' fees and out of pocket expenses incurred by us which may be caused by or arise directly or indirectly out of your breach of this Agreement.

## ARTICLE IX

9.1   <u>Confidential Nature of Agreement</u>.  You and we agree that this Agreement and the facts, circumstances or events that give rise to this Agreement are confidential and shall not be disclosed by you (except to your spouse, accountant, and attorneys, all of whom shall keep this Agreement and such facts, circumstances and events confidential) or by us without the prior written consent of the other unless such disclosure is required by law.  In the event of a violation of this provision, either of us may present this Agreement to any court of competent jurisdiction to obtain injunctive or monetary relief.  In light of the difficulty of ascertaining damages for a violation of this Agreement, you agree to pay us liquidated damages in the amount of One Thousand Dollars ($1,000) for each violation, plus any other monetary damages we may establish, including reasonable attorneys' fees and court costs.

**Initials.**

9.2   <u>Return of Property; Repayment</u>.  You acknowledge that: (i) all keys, credit cards, phone cards, cellular phones, computer equipment, software, computer passwords, software manuals, dictation equipment, records containing data on guests, customers, owners, and homeowners, documents and information of a proprietary or confidential nature is our property and must be returned to us; and (ii) all expense advances, or any other amounts due us, must be repaid.  You further agree that we may withhold payment of the severance payment due you under Section 2.1 until all such properties have been delivered to us and all such monies owed have been repaid.

9.3   <u>Difference in Facts</u>.  You understand and agree that: (a) if facts regarding this Agreement or your employment with us differ from facts you and we now believe to be true, you expressly accept and assume the risk of such differences and agree that this Agreement shall remain a binding agreement between us notwithstanding such differences; (b) the consideration set forth in this Agreement fully compensates you for the risk such facts may be different; and (c) you will have no legal recourse against us if facts are indeed different.

## ARTICLE X

10.1   <u>Governing Law</u>.  You and we agree that this Agreement, regardless of where signed, is deemed by the Parties to have been made and entered into in the State of Arkansas and in all respects shall be interpreted, enforced, and governed under the laws of Arkansas.

10.2   <u>Entire Agreement</u>.  This Agreement (including the Exhibits to this Agreement) supersedes any other agreement, whether written or oral, that may have been made or entered into by any Party or any of their respective Affiliates (or by any director, officer or representative thereof) relating to the matters contemplated hereby.  This Agreement (together with the Exhibits) constitutes the entire agreement by and among the Parties and there are no agreements or commitments by or among such Parties except as expressly set forth herein.

10.3    No Reliance on Representations.  You represent and acknowledge that in executing this Agreement you do not rely and have not relied upon any representation or statement not set forth in this Agreement.  You further acknowledge that the only consideration for your signing and delivering of this Agreement to us are the terms stated above in this Agreement.

10.4    No Assignment.  You represent and warrant to us that you have not previously assigned or transferred to any person any Claims waived and released in this Agreement.

10.5    Specific Performance.  You or we shall be entitled to seek, in the event of a default by the other, the judicial remedy of specific performance.

10.6    Invalid Provisions.  You and we agree that the provisions of this Agreement are severable, and if any provision is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be modified to the minimum extent necessary to make such provision valid and enforceable, and the remainder of this Agreement shall remain as a binding agreement between us and shall not be affected by the illegal, invalid or unenforceable provision prior its modification.

10.7    Notices.  Any notices required or permitted to be given under this Agreement shall be given in writing and shall be deemed received: (i) when personally delivered to the relevant Party at such Party's address as set forth below, (ii) if sent by mail (which must be certified or registered mail, postage prepaid), when received or rejected by the relevant Party at such Party's address indicated below, or (iii) if sent by facsimile transmission, when confirmation of delivery is received by the sending Party:

If to us:            Cooper Communities, Inc.
                     903 North 47th Street
                     Rogers, AR  72756
                     Attn:  General Counsel
                     Voice:  (479) 246-6500
                     Fax:    (479) 246-6695

If to you:           _____
                     _____
                     _____
                     Phone:  (___)-___-_____
                     Fax:      (___)-___-_____

Either of us may change our address for the purposes of this Section 10.7 by giving notice to the other.

10.8    Expenses.  Except as otherwise expressly provided herein, each of us shall bear, as our own expense, all expenses incurred by each of us in the negotiation, execution and delivery of this Agreement.

10.9   _Successors and Assigns_.  This Agreement will be binding upon and inure to the benefit of each of us and our respective successors and permitted assigns, but will not be assignable or delegable in whole or in part by either of us without the prior written consent of the other.

10.10   _Waiver_.  A failure or delay by either of us in exercising any right, power or privilege under this Agreement shall not operate as a waiver of such right, power or privilege; nor shall any single or partial exercise of any such right, power or privilege preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder.

10.13   _No Third Party Beneficiaries_.  No person or entity not a party to this Agreement shall be deemed to be a third party beneficiary hereunder or otherwise entitled to any rights hereunder.

10.14   _Further Assurances_.  From time to time, as and when requested by either of us, the other will sign and deliver, or cause to be signed and delivered, all such documents and instruments reasonably necessary to carry out the purposes of this Agreement.

10.15   _Execution in Counterparts_.  This Agreement may be signed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement.

10.16   _Titles and Headings_.  Titles and headings to Sections are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

10.17   _Certain Interpretive Matters and Definitions_.

   (i)   Unless the context otherwise specifically requires: (aa) all references to Sections, Articles or Schedules are to Sections, Articles or Schedules of or to this Agreement, (bb) each term defined in this Agreement has the meaning assigned to it, (cc) words in the singular include the plural and vice versa, (dd) the term "person" means any natural person or entity; (ee) the words "herein," "hereof," "hereunder" and words of like import shall refer to this Agreement as a whole and not to any particular section or subdivision of this Agreement; and (ff) the words "include," "includes" and "including" are not limiting.  All references to "$" or dollar amounts will be to lawful currency of the United States of America.

   (ii)   No provision of this Agreement will be interpreted in favor of, or against, either of us based upon the extent to which either of us or our counsel participated in the drafting thereof.

10.17   _No Recourse_.  Notwithstanding any of the provisions hereof, you agree that neither you nor any person acting on your behalf may assert any claims against any of our officers, directors, employees, stockholders, members or equity owners in connection with or arising out of this Agreement.

**[ACKNOWLEDGEMENT PAGES FOLLOW]**

Helen Natalie Bobsin.DOC 6/19/08                                        9

I, freely and knowingly, and after due consideration, enter into this Agreement, which contains a general release of claims, intending to waive and release in accordance with its terms all claims I have or may have against Cooper Communities, Inc.

_Helen Natalie Bobsin_ _4-17-09_
Helen Bobsin                Date

## ACKNOWLEDGEMENT

SUBSCRIBED AND SWORN to before me on the _17_ day of _April_, 20_09_.

> OFFICIAL SEAL
> SUZANNE L. YOUNG
> NOTARY PUBLIC . ARKANSAS
> BENTON COUNTY
> COMMISSION EXP. 07/01/2010

_Suzanne McYoung_
NOTARY PUBLIC

My Commission Expires: _____

COOPER COMMUNITIES, INC.

By: _____
Senior Vice President

## ACKNOWLEDGEMENT

STATE OF ARKANSAS      )
                       ) ss:
COUNTY OF BENTON       )

On this day before me, April 13, 2009, a Notary Public duly commissioned, qualified and acting within and for the said County and State, appeared in person the within named M. Kent Burger, to me personally well known, who stated that he was the Senior Vice President of Cooper Communities, Inc., a Delaware corporation, and was duly authorized in his respective capacity to sign the foregoing instrument for and in the name and behalf of said corporation, and further stated and acknowledged that he had so signed, signed and delivered the foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

Given under my hand and official seal this _13_ day of _April_, 20_09_.

_Carmen Burasco_
Notary Public

> CARMEN BURASCO
> Arkansas - Washington County
> Notary Public - Comm# 12367469
> My Commission Expires Sep 15, 2018

Helen Natalie Bobsin.DOC 6/19/08                    10

FILED

2012 JAN 27 AM 9 02

BRENDA DESHIELDS
CLERK AND RECORDER
BENTON COUNTY, ARK

IN THE CIRCUIT COURT OF BENTON COUNTY, ARKANSAS

ESCAPES! INC.; COOPER COMMUNITIES, INC.,
A Delaware Corporation; COOPER REALTY
INVESTMENTS, INC., an Arkansas Corporation;
COOPER LAND DEVELOPMENT, INC., an Arkansas
Corporation; ESCAPES! TRAVEL CHOICES, LLC,
an Arkansas Limited Liability Company; and
ESCAPES! PROPERTY MANAGEMENT, LLC,
an Arkansas Limited Liability Company                          **PLAINTIFFS**

VS                              Case No. <u>CV-2012-64-4</u>

J. PAUL TAPPANA and
STONEBRIDGE MANAGEMENT, LLC,
A Missouri Limited Liability Company                           **DEFENDANTS**

## CONSENT DECREE ORDERING INJUNCTION

Now on this 27th day of January, 2012, the above captioned matter comes on to

be heard upon Plaintiffs' verified Complaint for Injunction and Temporary Restraining

Order.  J. Paul Tappana and Stonebridge Management, LLC deny the allegations in the

Complaint and maintain that their actions conform to the requirements of the law and

deny that relief is available to the Plaintiffs;

However, the parties have negotiated in good faith and have reached a

settlement of the issues raised in the Complaint and present the following terms to the

Court for consideration;

Now, therefore, without any admission of fact or law, without conceding any

claims or defenses, and without any findings with respect to the merits or allegations in

1

31663.2 1/26/2012

the Complaint, but pursuant to the settlement of the parties, it is hereby ORDERED, ADJUDGED AND DECREED as follows: :

     1.    For the sole and limited purpose of this injunction, the Court has jurisdiction over the subject matter and persons herein.

     2.    J. Paul Tappana is a resident of Reed Springs, Missouri and until April 15, 2011 was an employee of Escapes!, Inc.

     3.    Stonebridge Management, LLC is a Missouri limited liability company formed for the purpose of property management of condominiums and time shares. When it was originally formed, its principals were Phil D. West and J. Paul Tappana.

     4.    The Court finds that on January 1, 2012, Stonebridge Management, LLC purported to enter into a management agreement with Palm Beach Vacation Owners Association, Inc.   A copy of said purported management agreement is attached to this order.

     5.    Escapes! Inc. is the developer of time share resorts located in Branson, Missouri, Hot Springs, Arkansas, Bella Vista, Arkansas, Orange Beach, Alabama, Panama City Beach, Florida, and Galveston, Texas.   In Branson, Missouri, Escapes! Inc. developed four (4) separate time share resorts.   In Orange Beach, Alabama, Escapes! Inc. developed two (2) separate units, Palm Beach Condominium and Escapes! To the Shores Condominium.

     6.    Central to the operation of each time share resort developed by Plaintiffs is the management of various essential services of a time share resort.  These essential services include activities such as reservations, check-in, check-out, maintenance, landscaping, management of assessments, scheduling of vacations, coordination with

2

31663.2 1/26/2012

other affiliated time share resorts for the exchange of vacation weeks between the respective owners, and the general maintenance and operation of a condominium/time share resort. Escapes! Property Management, LLC (EPM) is a wholly owned subsidiary of Escapes! Inc. EPM manages the essential functions of scheduling, administration, maintenance and upkeep for time share resort/condominiums developed by Plaintiffs.

Escapes! Travel Choices, LLC (ETC) is a wholly owned subsidiary of Escapes! Inc. ETC controls the reservation function for the Escapes! Travel Choices points program which allows reservations to be made at various affiliated resorts according to rules established by ETC.

7.     Each time share resort developed by Plaintiffs requires the services of a management company to perform the essential services set out above. The proper and efficient operation of the property management function is critical to the enjoyment of the time share resort and condominium properties purchased by their respective owners. Absent the proper, efficient and effective management of the time share resort/condominiums, the value of an owner's investment in a condominium or time share resort is substantially reduced. Likewise, absent the efficient, proper and effective management of the various properties by the management company, the value of the remaining inventory owned by Plaintiffs in the various time share resort/condominiums is substantially reduced.

8.     The declarations and by-laws of each time share resort/condominium facility govern the management of the facility through non-profit corporations comprised of timeshare and/or condominium owners. A facility may have a Condominium Owners Association (COA) or a Vacation Owners Association (VOA) or, in some instances, may

31663.2 1/26/2012

have both organizations.  The COA and VOA are separate non-profit organizations. The officers of the non-profit corporations are elected pursuant to the rules of election provided in the specific resort declaration and by-laws.  The Palm Beach Condominium is governed by two associations, Palm Beach Vacation Owners Association, Inc. and Palm Beach Condominium Owners Association, Inc.

9.     Each time share resort/condominium is governed by their respective COA or VOA.  In most instances, the COA and/or VOA choose to discharge their management functions by entering into management agreements with a property management company to provide the management services essential to the operation of the time share resort/condominium in exchange for a management fee based upon assessments of the units committed to interval or whole ownership.

10.    Prior to May 20, 2011, Separate Defendant J. Paul Tappana was employed by Escapes! Inc. as well as Escapes! Property Management, LLC.  He was principally responsible for the entire time share business of Plaintiffs including development, sales, and management of the units.

11.    On May 20, 2011, Separate Defendant J. Paul Tappana entered into an Agreement with Plaintiff Escapes! Inc. on behalf of all of the named Plaintiffs above. The Agreement was filed with the Court as a confidential document, Exhibit "A", and remains under seal in the records of the Circuit Clerk.

12.    The Agreement marked Exhibit "A" was entered into for good and valuable consideration and conferred numerous substantial benefits upon Separate Defendant J. Paul Tappana as well as obligated him to refrain from certain activity and actions which would be severely detrimental and would cause irreparable harm to Plaintiffs.

31663.2 1/26/2012

13.     Specifically, J. Paul Tappana agreed not to offer employment to any of Plaintiffs' employees; not to hire or attempt to hire any employees of Plaintiffs; not to induce or attempt to induce any employee of Plaintiffs to (1) terminate his/her employment with any of Plaintiffs' or Plaintiffs' affiliates; (2) become employed by a competitor of Plaintiffs' or Plaintiffs' affiliates;   or (3) establish or participate in establishing, in any market which Plaintiffs' operate, any business in which are engaged at the time of the inducement or attempt to induce.  Furthermore, J. Paul Tappana agreed that he would not compete with any of the Plaintiffs and he agreed to some specific terms defining the competition he was prohibited from conducting.  Specifically, he agreed not to:

"(1)     Directly or indirectly engage within a three (3) mile radius of any of Company's business locations (the "Territory"), …in the offering or providing (either directly or through an entity:  (a) owned in whole or in party buy you; (xxx) by which you are employed; (b) from which you receive, in any way or form, compensation, such as, but not limited to, compensation received by you through acting as a consultant; or (c) for your own account, for the account of your employer or for the account of a principal for whom you or your employer acts as broker or agent) in the sale of any merchandise or the providing of any services that are similar to or competitive with any goods and merchandise or any service offered by Company.  For purposes of this Letter, you will be deemed to be indirectly engaged in the offering or provision of services if you serve as an officer, director, employee or agent of, or otherwise advise or assist or have any material active or passive interest (whether as proprietor, partner, stockholder, lender, or otherwise but excluding the ownership of less than 5% of the outstanding shares or other units of a class of publicly traded securities) in any person, firm, corporation, association, or other business entity that is engaged in the offering or provision of those services, and you or any person, firm, corporation, association or other business entity will be deemed to be engaged in the offering or provision of services in the Territory if you or they provide or offer those services at or from a location, to persons resident, or regarding real property located in the Territory; or

(2)     In any capacity, solicit (for your own account, for the account of your employer or for the account of a principal for whom you or your employer acts as broker or agent), in competition with Company, business

5

from any client, customer, contractor or subcontractor with which Company has done business within one (1) years prior to the date of your execution and delivery of this Letter."

14.     Separate Defendant J. Paul Tappana further agreed that remedies at law for any breach by the other party of the obligations contained in the Agreement would be inadequate and that the non-breaching party would be entitled to injunctive or other equitable relief for any violation, without posting any bond that might otherwise be required.  He further agreed to treat any non-public or confidential information which he had received regarding any of Plaintiffs' business operations, customers, employees, plans, prospects and properties confidential and agreed to not use it in any manner detrimental to Plaintiffs.

15.     Notwithstanding the terms of the agreement entered into on May 20, 2011, J. Paul Tappana and Phil D. West organized Separate Defendant Stonebridge Management, LLC for the purposes set out above.

16.     On January 1, 2012, Stonebridge Management, LLC purported to enter into a management agreement contract with Palm Beach Vacation Owners Association, Inc., a condominium complex in Orange Beach, Alabama originally developed by Plaintiffs and with which Plaintiffs have had a management agreement since February 18, 2001.

17.     Although Stonebridge Management, LLC is not a party to the restrictive covenants contained in Exhibit "A" to the Plaintiff's Complaint, on January 1, 2012, J. Paul Tappana was an organizing member of Stonebridge Management, LLC. Stonebridge Management LLC registered as a foreign entity in the State of Alabama while J. Paul Tappana was a member, and purported to enter into the management

6

31663.2 1/26/2012

agreement with Palm Beach Vacation Owners Association, Inc.   The Court determines that the execution and performance of said management agreement between Palm Beach Vacation Owners Association, Inc. and Stonebridge Management, LLC is a direct violation of the May 20, 2011 agreement entered into between J. Paul Tappana and Plaintiffs.

18.   J. Paul Tappana and Stonebridge Management, LLC are hereby enjoined and prohibited from performing said management agreement contract or any similar contract between Palm Beach Vacation Owners Association, Inc.

19.   Subsequent to the initiation of this lawsuit J. Paul Tappana has severed any and all ties with Stonebridge Management, LLC and is no longer affiliated in any way with said Stonebridge Management, LLC. in any capacity, in any state.

20.   J. Paul Tappana, individually, is further enjoined from any taking any action or activity intended to entice or encourage the employees of Escapes! Property Management, LLC to terminate their employment with Escapes! Property Management, LLC or any of its affiliated companies.   Defendant J. Paul Tappana, individually, is further enjoined from taking any action to effectuate changes in the management of the various time share resort/condominium properties developed by Plaintiffs in any of the markets where Plaintiffs presently conduct time share resort/condominium business unless and until Plaintiffs grant J. Paul Tappana the right to engage in the management of time share resort/condominiums with any of its time share resort/condominiums. Said consent shall be in writing.  J. Paul Tappana, individually, is further enjoined from disclosing or utilizing, in any manner detrimental to Plaintiffs, any trade secrets or non-public or confidential information which Tappana have received regarding any of

7

Plaintiffs' business operations, customers, employees, plans, prospects and properties.

21.     The Court specifically finds that if the parties agree in writing that J. Paul Tappana may engage in the time share resort/condominium management of time share resort/condominiums developed by Plaintiffs or within a three mile radius of any of Plaintiffs' business locations, in that event J. Paul Tappana may thereafter engage in time share resort/condominium management in the area where Plaintiffs have agreed, including the right to offer employment to any of Plaintiffs' employees or former employees.

22.     This injunction shall remain in full force and effect until (a) the expiration of a period of time ending one (1) year from and after the date of the closing of either a sale of Escapes!, Inc. as an entity or the sale by Escapes!, Inc. of all or substantially all of Escapes!, Inc.'s assets or (b) the expiration of a period of time ending May 20, 2013.


23.     The parties agree, and the Court specifically finds, that the prohibitions contained in this injunction shall not affect the positions of the Plaintiffs and Stonebridge Management, LLC as it relates to the ongoing negotiations concerning Oak Ridge Condominiums Phases I, II and III, and Stonebridge Village Condominiums, and Oaks Condominiums (collectively "the Missouri resorts") or regarding the association or associations governing each such Missouri resort.

24.     The Plaintiffs and separate defendant Stonebridge Management, LLC agree to promptly mediate the issues referenced in paragraph 22 and the Court hereby suspends further action in this docket following the entry of this Order pending the completion of said mediation. The court reserves the right for any Defendant to file an

8

Answer to this Complaint and reserves the right for any Defendant to raise affirmative defenses including lack of personal jurisdiction should this matter proceed further.

    IT IS SO ORDERED.

                                                                                                                                                  _____

                                                                                                               JOHN R. SCOTT, CIRCUIT JUDGE

APPROVED AS TO FORM:

_____
DAVID R. MATTHEWS, PLAINTIFFS' ATTORNEY

_____
TIMOTHY HUTCHINSON, ATTORNEY FOR
STONEBRIDGE MANAGEMENT, LLC

_____
PHIL D. WEST, ON BEHALF OF
STONEBRIDGE MANAGEMENT, LLC

_____
DON BRADY, ATTORNEY FOR J. PAUL TAPPANA

_____
J. PAUL TAPPANA

31663.2 1/26/2012

p.1

APPROVED AS TO FORM:

_____
DAVID R. MATTHEWS, PLAINTIFFS' ATTORNEY

_____
TIMOTHY HUTCHINSON, ATTORNEY FOR
STONEBRIDGE MANAGEMENT, LLC

_____
PHIL D. WEST, ON BEHALF OF
STONEBRIDGE MANAGEMENT, LLC

_____
DON BRADY, ATTORNEY FOR J. PAUL TAPPANA

_____
J. PAUL TAPPANA

Field Code Changed

10

# MANAGEMENT AGREEMENT
## STONEBRIDGE MANAGEMENT, LLC and PALM BEACH VACATION OWNERS ASSOCIATION, INC

### PARTIES

THIS AGREEMENT, made this 1st day of January, 2012, by and between Palm Beach Vacation Owners Association, Inc., hereinafter referred to as "PBVOA" and StoneBridge Management, LLC, an Arkansas Limited Liability, hereinafter referred to as "Managing Agent".

### WITNESSETH

### Appointment:

The PBVOA hereby appoints Managing Agent and Managing Agent hereby accepts the appointment on the terms and conditions hereinafter provided, as exclusive agent of the PBVOA, located at 22984 Perdido Beach Blvd., Orange Beach, AL 36561 ("Property"). Managing Agent shall have the power, authority and duties to supervise the management and maintenance of the PBVOA, and shall perform the duties and carry out the functions of the PBVOA as provided and specified in the Declaration of Covenants and Restrictions for the property and all supplements, addendums and amendments thereto (hereinafter referred to as the "Declarations"), a copy of which is hereto attached and by this reference incorporated herein, as though the terms and provisions were set forth in full.

### Term:

The term of this Agreement shall be from the date of the execution thereof and continue through December 31, 2012. Thereafter, this Agreement shall automatically renew for successive one (1) year periods upon the same terms and conditions then in effect unless either party advises the other party in writing at least sixty (60) days prior to the expiration of the initial term or any successive term that it does not wish to extend the Agreement. This Agreement may be terminated for cause by either party with no less than sixty (60) days written notice to the other party.

### Management Services:

Except as expressly provided to the contrary, Managing Agent shall have all the powers and duties of the PBVOA as set forth in the Declarations and the PBVOA Bylaws, (except those specifically required to be exercised by the PBVOA's Board of Directors or members) shall render the following services at the PBVOA's expense:

### Contract and Physical Administration:

1. Perform regular property inspections of the grounds, common areas, walkways, stairwells, unit exteriors and unit interiors, delivering results of such to the PBVOA with recommendations if needed.

2. Supervise the maintenance and repair of the grounds, common areas, walkways, unit exteriors and unit interiors and maintain the equipment of the PBVOA used to maintain such areas. Any item of repair or replacement shall not exceed the sum of $5,000.00, unless specifically authorized by the Board of Directors, except in case of an emergency.

3. Managing Agent possesses sole authority to maintain and replace personal property within the units, including décor and all other judgments related to the units, and to maintain the standard quality of the property as originally contained in such unit at the time it is committed to interval ownership. A portion of maintenance fees shall be set

aside as a reserve for future replacements and repairs as set forth in the proposed annual budget.

4. Purchase or rent on PBVOA's behalf, all equipment, tools, appliances, materials, supplies, uniforms and other items necessary for the management, maintenance and operation of the property. Tangible property shall be titled in the name of the PBVOA.

5. Solicit, analyze and negotiate contracts for services of contractors to perform requisite grounds maintenance, landscaping, exterior lighting, maintenance of unit interiors and all other services required to perform the functions under this Agreement. Such performance shall be closely monitored and changes may be recommended based upon review.

6. Managing Agent shall cause alterations and/or additions to the common elements as authorized by the Board of Directors, and shall be reimbursed for its costs incurred, including, without limitation, the cost of its personnel, overhead, materials, equipment, and any and all amounts payable to contractors, subcontractors or materialmen.

7. Assist the Board of Directors in hiring professionals, such as attorneys, consultants, engineers, surveyors, etc., on behalf of the PBVOA.

8. Recruit, hire, train and supervise all personnel and provide an on-site property manager to oversee the performance of obligations set forth herein. The status of an employee's position shall be determined by Managing Agent as to whether that employee is employed by Agent or the PBVOA. All employees shall be compensated independently from and in addition to the fees set forth in this Agreement and if employed by Managing Agent, shall be reimbursed by the PBVOA for the employee's wages or work performed.

9. Managing Agent shall develop and oversee owners use plans, owner reservations, check-in services and inventory utilization. Managing agent shall act as the liaison with the owners and use its best efforts in resolving any owner issues.

10. Procure supplies and equipment required to perform the functions set forth in this Agreement, which shall be reimbursed by the PBVOA. No equipment that exceeds $5,000.00 shall be purchased without approval of the Board of Directors of the PBVOA, except in an emergency.

11. Managing Agent may enter into agreements to grant concessions and licenses to persons to provide facilities and services as, to, and within the property and may cause coin vending machines, coin operated equipment and pay phones to be installed at the expense of the PBVOA. All income derived from such will inure to the benefit of the PBVOA. Agent will use its best effort to ensure terms are most favorable to the PBVOA's interest.

12. Provide lockout services or unit access which will be reimbursed by the PBVOA.

13. Cleanup, repairs or replacement work in the event of a major storm shall be subject to a negotiated fee with the PBVOA Board of Directors. Agent is authorized to restore such loss whether or not covered by insurance, pursuant to the Declarations, and total assessment is equal to the cost of repair, including the costs of Agent's personnel, materials, equipment, contractors, subcontractors or materialmen. Any insurance proceeds shall first be applied toward the costs of repair and then any assessments collected. Should there be a surplus of funds, the surplus shall be distributed to the members.

14. Maintain signs designating the presence of and management by Managing Agent. Approval shall be obtained from the PBVOA Board of Directors prior to erection of such signs, and such approval shall not be unreasonably withheld. Execution of this Agreement designates approval of Managing Agent's logo, attached hereto as Exhibit "A".

**Fiscal and Accounting Services:**

1. Maintain the PBVOA's financial record books, accounts and other records as provided by the Bylaws and the Declarations; issue certificates of account to members, their mortgagees and lienors without liability for errors. An expert employed by the PBVOA may review such records or may conduct an external audit upon reasonable notice to Agent.

2. Managing Agent shall render a financial report for each calendar year no later than May 1st next thereafter.

3. Managing Agent shall engage an accounting firm, acceptable to the Board of Director, to conduct an annual independent certified audit.

4. Maintain records in accordance with accounting standards which identify the source of all funds collected and disbursed by Managing Agent. Such records will be kept at an agreed location and shall be available for inspection by an expert employed by the PBVOA upon reasonable notice to the Agent.

5. Managing Agent shall submit annually to the PBVOA Board a proposed operating budget, setting forth anticipated income and expense for the year, and each member's annual share thereof. Any increase in assessments shall be proposed to the PBVOA Board and if approved, will be collected by Agent. Notwithstanding its delegation, the PBVOA retains the power to make those assessments set forth in the Declarations and Bylaws.

6. Application of assessments shall be at Managing Agent's sole discretion as set forth in the Declarations and Bylaws, including Agent's fee, overhead and expenses. During the term of this Agreement, Agent may file a lien against a member's use week(s) for failure to pay assessments or maintenance fees. Likewise, Agent may compromise liens in such amounts as it deems advisable and it may satisfy liens of record and render statements regarding current status.

7. PBVOA shall aid and assist Managing agent in its collection of assessments in any reasonable manner requested. Agent may compromise any debt owed to the PBVOA by its members without approval of the PBVOA Board of Directors, unless it exceeds $3,000.00.

8. Managing Agent may assess any member of the PBVOA a special assessment based upon specific personal circumstances or occurrences, i.e., maintenance, repairs or replacements caused by negligence or misuse; or for violation of the provisions of the Declarations or Bylaws.

9. Managing Agent may deny a member and/or authorized user access to the member's vacation interval if an assessment has not been paid within 10 days after its due date.

**Bank Accounts:**

1. Maintain bank accounts in a bank whose deposits are insured by the Federal Deposit Insurance Corporation, in a manner to indicate the custodial nature thereof, for the deposit of funds collected or accruing from the members on behalf of the PBVOA. Funds deposited shall remain the property of the PBVOA subject to disbursement of expenses by Managing Agent as described in this Agreement. No amounts deposited in any account shall in any event be commingled with any other funds of Agent or other PBVOAs. Agent is authorized to make disbursements from the operating or other accounts for PBVOA expenses within the PBVOA's budget or as authorized by the Board of Directors.

2. Maintain reserve accounts as set forth in the proposed annual budget to the PBVOA for future replacements and repairs and as directed by the Board of Directors.

3. Managing Agent shall not pay common expenses from its own funds and shall only be required to perform its services and make disbursements so long as revenue from assessments is sufficient. In the event the balance of any account shall at any time be

insufficient to pay disbursements due and payable, Agent will determine the additional assessments required and advise the PBVOA and members accordingly.

4. Agent shall not be liable in the event of bankruptcy or failure of a depository.

**Insurance:**

1. Review and recommend any and all insurance policies for which the PBVOA is the named insured, including, but not limited to, fire, casualty, theft, general liability, public liability, and worker's compensation procured by the PBVOA. Sole responsibility for such insurance coverage rests with the PBVOA.

2. The PBVOA will continue to maintain a protection and indemnity liability policy, including coverage for bodily injury and property damage at a minimum of not less than $1,000,000.00 combined single limit coverage for each occurrence. The PBVOA and Managing Agent, along with the directors, officers, employees, agents and representatives of both parties shall be named insureds under such policy.

3. Managing Agent shall receive a certificate of insurance within 30 days of the execution of this Agreement and 30 days' notice shall be provided in the event of cancellation, material change, alteration or amendment of the policy.

4. Managing Agent shall act as Agent for the PBVOA in procuring insurance and claims settlement, to include adjusting claims, filing suit, delivering releases, and accepting proceeds on behalf of the PBVOA, subject to the provisions of the Declarations.

5. Managing Agent shall not act as agent for individual members of the PBVOA and any previous insurance litigation prior to this Agreement will not be managed by Agent.

**Records and Correspondence:**

1. Maintain files for the PBVOA of all documents germane to the performance of duties set forth under this Agreement.

2. Assist with the delivery of owner communications including newsletters, special notices, questionnaires, and other communications.

3. Implement a 24-hour emergency call service utilizing radios, beepers, and/or phones to provide rapid response assistance in emergency situations.

4. Assist in resolving individual owner problems applicable to Managing Agent's performance of duties hereunder.

5. Provide assistance to the Board of Directors in outlining and amending the Rules and Regulations for the PBVOA.

6. Promulgate, adopt and amend the Rules and Regulations as it deems advisable in its sole discretion for the use and occupancy of the property and enforce same. Managing Agent shall have the right to suspend any member and/or unauthorized user of PBVOA properties for any infraction of the Rules and Regulations pertaining to the use of such facilities for a period not exceeding seven days. No reduction in the assessment during the suspension will be granted.

**Meetings - Board of Directors and Annual Meetings:**

Managing Agent shall attend the Annual Owners Meeting and up to four scheduled meetings of the PBVOA Board of Directors per year. Notices of all meetings shall be delivered to Agent for which PBVOA Board of Directors and/or members are delivered notice, and Agent is entitled to attend all such meetings, except executive sessions which are closed to all but PBVOA directors or members. Minutes of all PBVOA meetings shall be taken by the PBVOA's Secretary, and possession of the Minute Book shall rest in the custody of said Secretary.

**Managing Agent's Fee:**

1. Managing Agent shall receive as compensation for its services, a fee of ten percent (10%) of the annual revenue. The fee should be paid monthly, based on the previous month's revenue. Such amount will be designated "Management Fee". The PBVOA will also reimburse or pay directly costs that are easily ascertainable and chargeable to the PBVOA. Agent will not be reimbursed for those expenses considered to be general management overhead items, i.e., keeping Agent's books and records, officers' compensation from both income and reimbursement of expenses, and home office expenses not attributable to the property.

2. Managing Agent shall be reimbursed for other services conducted on behalf of the PBVOA:
   a. Copies will be provided at the rate of ten cents ($.10) per copy;
   b. Postage at the prevailing legal rate;
   c. Envelopes will be provided at the rate of fifteen cents ($.15) per envelope;
   d. Faxes will be provided at the rate of $1.00 per page;
   e. Long distance carrier charges at Agent's current carrier's rate;
   f. Travel conducted on official business at the prevailing rate set by the IRS; and
   g. All costs associated with effectuating the purpose, and executing the provisions of this Agreement, except to the extent otherwise set forth herein.

**Scope of Contract:**

1. Tasks performed outside the scope of this Agreement shall first be discussed with the PBVOA Board of Directors prior to execution, and a mutually agreed rate of compensation shall be in writing, prior to commencement of such task.

2. Court appearances, depositions, or consultations with attorneys in connection with litigation filed or proposed on behalf of or directed to the PBVOA *shall not* be provided by Managing Agent as part of the services it shall perform pursuant to the terms of this Agreement.

3. Shall have the right to serve as the exclusive rental agent for vacation intervals owned by the PBVOA and shall provide rental services for the members. All reservation and check-in services shall be provided by Agent. Agent may subcontract these services to third parties. A mutually agreed rate of compensation shall be in writing, prior to commencement of such task.

4. Shall have the right to serve as the exclusive sales and marketing agent for vacation intervals owned by the PBVOA and shall have the right to provide resale services for the members. Agent shall have the right to subcontract these services to third parties. A mutually agreed rate of compensation shall be in writing, prior to commencement of such task.

5. Time is of the essence in performance of every particular herein.

6. The PBVOA shall not interfere with nor permit, allow or cause any of the Officers, Directors or members to interfere with Managing Agent's performance of its duties or powers hereunder.

**Proprietary Information:**

1. Access to software programs, databases, and other information proprietary to the PBVOA shall be granted to Managing Agent for performance of its duties during the term of this Agreement. Agent agrees to use such information in strictest confidence and shall not reproduce nor allow any other party to reproduce any of this software or information. Agent's right to use this information shall terminate upon the cancellation or termination of this Agreement. Information acquired prior or during the performance of this Agreement, which would have been acquired regardless of the performance of duties, shall not be considered proprietary for the purposes of this paragraph 1.

2. The PBVOA shall maintain all information it receives regarding Managing Agent's owners, affiliates or guests in strictest confidence, and shall not distribute same to third parties.

**Dispute Resolution:**
Should any dispute arise between the parties, including the powers and duties of the parties and all the terms and conditions of this Agreement, both parties shall meet to resolve the dispute. If the dispute cannot be resolved between the parties, then either party shall have the right to submit the matter in controversy to the American Arbitration Association or any other arbitration panel mutually agreed upon by the parties, to arbitrate the dispute. The results of this arbitration are binding upon both parties and the arbitrator is authorized to file the decision in the applicable court of jurisdiction. The arbitrator is to award reasonable attorney's fees and costs to the prevailing party.

**Authorized Agents:**
1. The PBVOA hereby designates PBVOA President or the following individual who shall be authorized to deal with Managing Agent on any matter pertaining to the obligations of either party to this Agreement: Paul Tappana or Phil West.
2. Managing Agent hereby designates Paul Tappana or Phil West, who shall be authorized to deal with the PBVOA on any matter pertaining to the obligations of either party to this Agreement.

**Modification of Waiver:**
No modification, release, discharge, or waiver of any provision hereof shall be of any force, effect or value, unless in writing and signed by the parties to this Agreement. Failure of either party to enforce any of the provisions of this Agreement shall not be construed to be a waiver of such, nor affect the validity of this Agreement, nor affect the right of either party to thereafter enforce each and every provision.

**Integration Clause:**
This instrument constitutes the entire agreement between the parties, as of the date of its execution, and neither has been induced by the other by representations, promises or understandings, nor collateral agreements, stipulations, or promises or understandings touching the subject matter of this instrument, or the instruments referred to herein, which are not expressly contained herein.

**Invalidity:**
The invalidity in whole or in part of any covenant, promise or undertaking, or of any section, sub-section, sentence, clause, phrase or word, or of any provision of this Agreement, shall not affect the validity of the remaining portions hereof.

**Termination of Agreement:**
This Agreement may be terminated for cause by either party with no less than 60 days' notice to the other party.

**Events upon Termination:**
Should the PBVOA terminate, then each member shall become tenants in common as set forth in the Declarations and shall continue to be a party to this Agreement and bound by the provisions hereof as to his or her separate interest. Managing Agent shall manage such interest pursuant to the provisions of this Agreement as the context of this Agreement permits.

**Governing Laws:**
This Agreement shall be governed by the laws of the State of Missouri. In the event any provision contained in this Agreement conflicts with the laws of the State or any other governing law, then such provision shall be deemed invalid, but the remaining provisions shall remain in full force and effect.

**Indemnification:**
The PBVOA shall carry at its own expense, public liability insurance and furnish certificates to Agent evidencing such.

**Default**
If either party to this agreement fails to meet its requirements hereunder, the other party, 15 days after having given written notice to the non-performing party, may declare this Agreement in default unless such default is cured by the non-performing party within 15 days after notice. Either party may bring an action against the other for damages and/or specific performance and/or such other rights and remedies as it may have, and the prevailing party shall be liable for the other's reasonable attorney's fee and costs incurred thereby. All rights of the non-defaulting party, upon default shall be cumulative and one or more remedies may not be deemed to exclude or constitute a waiver of any other or additional remedy.

**Notice:**
Notice by either party to the other shall be in writing by Certified Mail, return receipt requested, and it shall be deemed given when it has been deposited in the United States Mail, addressed to the party for whom it is intended as follows:

FOR THE PBVOA:        Palm Beach Vacation Owners Association, Inc.
                      22984 Perdido Beach Blvd.
                      Orange Beach, AL 36561

FOR MANAGING AGENT:   StoneBridge Management, LLC
                      1739 Cedar Ridge Way
                      Reeds Spring, MO 65737

**Successors and Assigns:**
This Agreement shall inure to the benefit of the heirs, personal representatives, successors and assigns of the PBVOA, and the heirs, personal representatives, successors and assigns of Managing Agent. The PBVOA shall not assign its rights under this Agreement without the prior written consent of Agent. Agent may assign this Agreement to a wholly owned subsidiary of Agent, at any time, without obtaining prior written consent of the PBVOA. Agent shall have the right to sub-contract or assign all or portions of its duties and powers under this Management Agreement.

IN WITNESS WHEREOF, the parties have caused these presents to be executed respectively by their proper officers and their respective corporate seals have been affixed as of the year and date first above mentioned.

ATTEST:

By: _____

Title: _____

PALM BEACH VACATION OWNERS
ASSOCIATION, INC. (PBVOA)

By: _____

Title: _____

ATTEST:

By: _____

Title: _____

STONEBRIDGE MANAGEMENT, LLC
(MANAGING AGENT)

By: _____

Title: _____